# DOUGHERTY COUNTY, GEORGIA, BOARD OF EDUCATION ET AL. v. WHITE

No. 77–120.   Argued October 2–3, 1978—Decided November 28, 1978

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, and STEVENS, JJ., joined. STEVENS, J., filed a concurring statement, *post*, p. 47. STEWART, J., filed a dissenting statement,

*post,* p. 47. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post,* p. 47.

*Jesse W. Walters* argued the cause and filed a brief for appellants.

*John R. Myer* argued the cause for appellee. With him on the brief were *Robert A. Murphy, William E. Caldwell,* and *Norman J. Chachkin.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General McCree, Assistant Attorney General Days,* and *Brian K. Landsberg.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Under § 5 of the Voting Rights Act of 1965,[1] all States and

---

[1] 79 Stat. 439, as amended, 42 U. S. C. § 1973c. Section 5 provides in part:

"Whenever a State or political subdivision with respect to which the prohibitions set forth in [§ 4 (a) of the Act] based upon determinations made under the first sentence of [§ 4 (b) of the Act] are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, . . . such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, . . . and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. . . ."

political subdivisions covered by § 4 of the Act [2] must submit any proposed change affecting voting, for preclearance by the Attorney General or the District Court for the District of Columbia. At issue in this appeal is whether a county board of education in a covered State must seek approval of a rule requiring its employees to take unpaid leaves of absence while they campaign for elective office. Resolution of this question necessitates two related inquiries: first, whether a rule governing leave for employee candidates is a "standard, practice, or procedure with respect to voting" within the meaning of § 5 of the Voting Rights Act; and second, whether a county school board is a "political subdivision" within the purview of the Act.

I

The facts in this case are not in dispute. Appellee, a Negro, is employed as Assistant Coordinator of Student Personnel Services by appellant Dougherty County Board of Education (Board). In May 1972, he announced his candidacy for the Georgia House of Representatives. Less than a month later, on June 12, 1972, the Board adopted Rule 58 without seeking prior federal approval. Rule 58 provides:

"POLITICAL OFFICE. Any employee of the school system who becomes a candidate for any elective political office, will be required to take a leave of absence, without pay, such leave becoming effective upon the qualifying for such elective office and continuing for the duration of such political activity, and during the period of service in such office, if elected thereto."

Appellee qualified as a candidate for the Democratic primary in June 1972, and was compelled by Rule 58 to take a leave of absence without pay. After his defeat in the

---

[2] 79 Stat. 438, as amended, 42 U. S. C. § 1973b. Georgia has been designated a covered jurisdiction pursuant to § 4. 30 Fed. Reg. 9897 (1965).

August primary, appellee was reinstated. Again in June 1974, he qualified as a candidate for the Georgia House and was forced to take leave. He was successful in both the August primary and the November general election. Accordingly, his leave continued through mid-November 1974. Appellee took a third leave of absence in June 1976, when he qualified to run for re-election. When it became clear in September that he would be unopposed in the November 1976 election, appellee was reinstated.[3] As a consequence of those mandatory leaves, appellee lost pay in the amount of $2,810 in 1972, $4,780 in 1974, and $3,750 in 1976.

In June 1976, appellee filed this action in the Middle District of Georgia alleging that Rule 58 was a "standard, practice, or procedure with respect to voting" adopted by a covered entity and therefore subject to the preclearance requirements of § 5 of the Act.[4] Appellee averred that he was the first Negro in recent memory, perhaps since Reconstruction, to run for the Georgia General Assembly from Dougherty County. The Board did not contest this fact, and further acknowledged that it was aware of no individual other than appellee who had run for public office while an employee of the Dougherty County Board of Education.

On cross motions for summary judgment, the three-judge District Court held that Rule 58 should have been submitted for federal approval before implementation. 431 F. Supp. 919

---

[3] The Solicitor General and counsel for appellants advise us that appellee was also on unpaid leave during his participation in the annual 2½-month sittings of the Georgia General Assembly in 1975, 1976, 1977, and 1978. Brief for United States as *Amicus Curiae* 4 n. 1; Tr. of Oral Arg. 6. Appellee did not challenge this application of Rule 58 below. We therefore do not consider whether preclearance is required for a policy governing mandatory leaves during the interval in which an employee is actually absent due to legislative responsibilities.

[4] Jurisdiction was predicated on 42 U. S. C. § 1973c, 28 U. S. C. § 2284, and 28 U. S. C. § 1343. See *Allen* v. *State Board of Elections,* 393 U. S. 544, 554–563 (1969).

(1977). In so ruling, the court correctly declined to decide the ultimate question that the Attorney General or the District of Columbia court would face on submission of the Rule for preclearance under § 5—whether the change in fact had a discriminatory purpose or effect. See *Perkins* v. *Matthews*, 400 U. S. 379, 383–385 (1971). Rather, the District Court confined its review to the preliminary issue whether Rule 58 had the "potential" for discrimination and hence was subject to § 5. *Georgia* v. *United States*, 411 U. S. 526, 534 (1973). In concluding that the Rule did have such potential, the District Court interpreted *Allen* v. *State Board of Elections*, 393 U. S. 544 (1969), and *Georgia* v. *United States*, *supra*, to mandate preclearance of any modification by a covered State or political subdivision "which restricts the ability of citizens to run for office." 431 F. Supp., at 922. The court reasoned that Rule 58 was such a modification because:

> "By imposing a financial loss on [Board] employees who choose to become candidates, [the Rule] makes it more difficult for them to participate in the democratic process and, consequently, restricts the field from which the voters may select their representatives." *Ibid.*

The District Court therefore enjoined enforcement of Rule 58 pending compliance with the preclearance requirements of § 5. We noted probable jurisdiction. 435 U. S. 921 (1978). Since we find *Allen* v. *State Board of Elections, supra,* and *United States* v. *Board of Comm'rs of Sheffield,* 435 U. S. 110 (1978), dispositive of the issues presented in this appeal, we affirm.

## II

Section 5 provides that whenever a covered State or political subdivision "shall enact or seek to administer any voting qualification or prerequisite to voting, or *standard, practice, or procedure* with respect to voting different from that in force

or effect on November 1, 1964," it may not implement that change until it either secures a determination from the District Court for the District of Columbia that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or submits the change to the Attorney General and he interposes no objection within 60 days. 42 U. S. C. § 1973c (emphasis added). Although § 14 (c)(1) expansively defines the term "voting" to "include all action necessary to make a vote effective," 79 Stat. 445, 42 U. S. C. § 1973l (c)(1), the Act itself nowhere amplifies the meaning of the phrase "standard, practice, or procedure with respect to voting." Accordingly, in our previous constructions of § 5, we have sought guidance from the history and purpose of the Act.

### A

This Court first considered the scope of the critical language of § 5 in *Allen* v. *State Board of Elections,* 393 U. S. 544 (1969), involving consolidated appeals in three cases from Mississippi and one from Virginia. After canvassing the legislative history of the Act, we concluded that Congress meant "to reach any state enactment which altered the election law of a covered State in even a minor way." 393 U. S., at 566.[5] Conceived after "nearly a century of systematic resistance to the Fifteenth Amendment," *South Carolina* v. *Katzenbach,* 383 U. S. 301, 328 (1966),[6] the Voting Rights

---

[5] For example, we noted that Attorney General Katzenbach, who played a substantial role in drafting the Act, testified that the term "practice" in § 5 "was intended to be all-inclusive . . . ." Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 192 (1965), quoted in *Allen* v. *State Board of Elections, supra,* at 566–567, and n. 31.

[6] The protean strategies of racial discrimination that led Congress to adopt the Voting Rights Act have been often discussed by this Court, see *United States* v. *Board of Comm'rs of Sheffield,* 435 U. S. 110, 118–121 (1978); *South Carolina* v. *Katzenbach,* 383 U. S., at 308–315, and need not be reviewed here.

Act was, as *Allen* emphasized, "aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." 393 U. S., at 565 (footnote omitted). To effectuate the "articulated purposes of the legislation," *id.*, at 570, the *Allen* Court held that the phrase "standard, practice, or procedure" must be given the "broadest possible scope," *id.*, at 567, and construed it to encompass candidate qualification requirements. *Id.*, at 570 (*Whitley* v. *Williams*, companion case decided with *Allen*, *supra*). The Court concluded that any enactment which burdens an independent candidate by "increasing the difficulty for [him] to gain a position on the general election ballot" is subject to § 5 since such a measure could "undermine the effectiveness" of voters who wish to elect nonaffiliated representatives. 393 U. S., at 565.

In subsequent cases interpreting § 5, we have consistently adhered to the principles of broad construction set forth in *Allen*. In *Hadnott* v. *Amos*, 394 U. S. 358 (1969), this Court held that an Alabama statute requiring independent candidates to declare their intention to seek office two months earlier than under prior procedures imposed "increased barriers" on candidacy and therefore warranted § 5 scrutiny. *Id.*, at 366. Similarly, in contexts other than candidate qualification, we have interpreted § 5 expansively to mandate preclearance for changes in the location of polling places, *Perkins* v. *Matthews*, *supra;* alterations of municipal boundaries, *Richmond* v. *United States*, 422 U. S. 358 (1975); *Petersburg* v. *United States*, 410 U. S. 962 (1973), summarily aff'g 354 F. Supp. 1021 (DC 1972); *Perkins* v. *Matthews*, *supra;* and reapportionment and redistricting plans, *Georgia* v. *United States*, *supra*.

Had Congress disagreed with this broad construction of § 5, it presumably would have clarified its intent when re-enacting the statute in 1970 and 1975. Yet, as this Court observed in *Georgia* v. *United States*, "[a]fter extensive deliberations

in 1970 on bills to extend the Voting Rights Act, during which the *Allen* case was repeatedly discussed, the Act was extended for five years, without any substantive modification of § 5." 411 U. S., at 533 (footnote omitted). Again in 1975, both the House and Senate Judiciary Committees, in recommending extension of the Act, noted with approval the "broad interpretations to the scope of Section 5" in *Allen* and *Perkins* v. *Matthews*. S. Rep. No. 94–295, p. 16 (1975) (hereinafter S. Rep.); H. R. Rep. No. 94–196, p. 9 (1975) (hereinafter H. R. Rep.). Confirming the view of this Court, the Committee Reports stated, without qualification, that "[s]ection 5 of the Act requires review of *all* voting changes prior to implementation by the covered jurisdictions." S. Rep. 15; H. R. Rep. 8 (emphasis added).

The Attorney General's regulations, in force since 1971, reflect an equally inclusive understanding of the reach of § 5. They provide that "[a]ll changes affecting voting, even though the change appears to be minor or indirect," must be submitted for prior approval. 28 CFR § 51.4 (a) (1977). More particularly, the regulations require preclearance of "[a]ny alteration affecting the eligibility of persons to become or remain candidates or obtain a position on the ballot in primary or general elections or to become or remain office-holders." § 51.4 (c)(4). Pursuant to these regulations, the Attorney General, after being apprised of Rule 58, requested its submission for § 5 clearance.[7] Given the central role of the Attorney General in formulating and implementing § 5, this interpretation of its scope is entitled to particular deference. *United States* v. *Board of Comm'rs of Sheffield,*

---

[7] Shortly before the commencement of this litigation, counsel for appellee brought Rule 58 to the attention of the Civil Rights Division of the Department of Justice. Two and one-half months after appellee filed his complaint, Assistant Attorney General Pottinger informed the Superintendent of the Dougherty County School System that Rule 58 should be submitted for preclearance. Appellants made no response.

435 U. S., at 131; *Perkins* v. *Matthews,* 400 U. S., at 391.    See *Georgia* v. *United States,* 411 U. S., at 536–539.

## B

Despite these consistently expansive constructions of § 5, appellants contend that the Attorney General and District Court erred in treating Rule 58 as a "standard, practice, or procedure with respect to voting" rather than as simply "a means of getting a full days work for a full days pay—nothing more and nothing less." Brief for Appellants 20. In appellants' view, Congress did not intend to subject all internal personnel measures affecting political activity to federal superintendence.

The Board mischaracterizes its policy. Rule 58 is not a neutral personnel practice governing all forms of absenteeism. Rather, it specifically addresses the electoral process, singling out candidacy for elective office as a disabling activity. Although not in form a filing fee, the Rule operates in precisely the same fashion. By imposing substantial economic disincentives on employees who wish to seek elective office, the Rule burdens entry into elective campaigns and, concomitantly, limits the choices available to Dougherty County voters. Given the potential loss of thousands of dollars by employees subject to Rule 58, the Board's policy could operate as a more substantial inhibition on entry into the elective process than many of the filing-fee changes involving only hundreds of dollars to which the Attorney General has successfully interposed objections.[8]   That Congress was well aware of these objections is apparent from the Committee Reports supporting extension of the Act in 1975. S. Rep. 16–17; H. R. Rep. 10.[9]

---

[8] See U. S. Commission on Civil Rights, The Voting Rights Act: Ten Years After 134–137 (1975) (*e. g.,* $360 fee for Commissioner in Mobile, Alabama, in 1973; $818 fee for Mayor in Rock Hill, South Carolina, in 1973).

[9] In addition, the Committees relied heavily on findings by the United States Commission on Civil Rights in The Voting Rights Act: Ten Years

In *Georgia* v. *United States*, we observed that "[s]ection 5 is not concerned with a simple inventory of voting procedures, but rather with the reality of changed practices as they affect Negro voters." 411 U. S., at 531. The reality here is that Rule 58's impact on elections is no different from that of many of the candidate qualification changes for which we have previously required preclearance. See *Hadnott* v. *Amos*, 394 U. S. 358 (1969); *Allen*, 393 U. S., at 551.[10] Moreover, as a practical matter, Rule 58 implicates the political process to the same extent as do other modifications that this Court and Congress have recognized § 5 to encompass, such as changes in the location of polling places, *Perkins* v. *Matthews*, and alterations in the procedures for casting a write-in vote, *Allen* v. *State Board of Elections, supra.*

We do not, of course, suggest that all constraints on employee political activity affecting voter choice violate § 5. Presumably, most regulation of political involvement by public employees would not be found to have an invidious purpose or effect. Yet the same could be said of almost all changes subject to § 5. According to the most recent figures available, the Voting Rights Section of the Civil Rights Division processes annually some 1,800 submissions involving over 3,100 changes and interposes objections to less than 2%. Attorney General Ann. Rep. 159–160 (1977). Approximately

---

After, *supra*, at 131–142, a document which reviewed at some length the barriers to qualification, including filing fees, faced by minority candidates. See S. Rep. 21, 24; H. R. Rep. 12, 16.

[10] As this Court has recognized in its decisions invalidating certain filing-fee schemes under the Fourteenth Amendment, "we would ignore reality" were we not to acknowledge that a financial barrier to candidacy "falls with unequal weight on voters, as well as candidates," since it "tends to deny some voters the opportunity to vote for a candidate of their choosing." *Bullock* v. *Carter*, 405 U. S. 134, 144 (1972) (filing fees of $1,424.60 for County Commissioner, $1,000 for Commissioner of General Land Office, and $6,300 for County Judge). See also *Lubin* v. *Panish*, 415 U. S. 709 (1974) (filing fee of $701.60 for County Supervisor).

91% of these submissions receive clearance without further exchange of correspondence. Tr. of Oral Arg. 53. Thus, in determining if an enactment triggers § 5 scrutiny, the question is not whether the provision is in fact innocuous and likely to be approved, but whether it has a *potential* for discrimination. See *Georgia* v. *United States, supra,* at 534; *Perkins* v. *Matthews, supra,* at 383–385; *Allen* v. *State Board of Elections, supra,* at 555–556, n. 19, 558–559, 570–571.

Without intimating any views on the substantive question of Rule 58's legitimacy as a nonracial personnel measure, we believe that the circumstances surrounding its adoption and its effect on the political process are sufficiently suggestive of the potential for discrimination to demonstrate the need for preclearance. Appellee was the first Negro in recent years to seek election to the General Assembly from Dougherty County, an area with a long history of racial discrimination in voting.[11] Less than a month after appellee announced his candidacy, the Board adopted Rule 58, concededly without any prior experience of absenteeism among employees seeking office. That the Board made its mandatory leave-of-absence requirement contingent on candidacy rather than on absence during working hours underscores the Rule's potential for inhibiting participation in the electoral process.[12]

---

[11] For a review of voting rights litigation in the city of Albany, the county seat of Dougherty County containing 80% of its population, see *Paige* v. *Gray,* 399 F. Supp. 459, 461–463 (MD Ga. 1975), vacated in part, 538 F. 2d 1108 (CA5 1976), on remand, 437 F. Supp. 137, 149–158 (MD Ga. 1977).

[12] The dissent suggests, *post,* at 53, that Rule 58 is directed only toward barring "the expenditure of public funds to support the candidacy of an employee whose time and energies may be devoted to campaigning, rather than counseling schoolchildren." Insofar as the Board is concerned about its employees' failure to discharge their contractual obligations while standing for office, it has a variety of means to vindicate its interest. The Board may, for example, prescribe regulations governing absenteeism, or may terminate or suspend the contracts of employees who willfully neglect

Plainly, Rule 58 erects "increased barriers" to candidacy as formidable as the filing date changes at issue in *Hadnott* v. *Amos, supra,* at 366 (2 months), and *Allen* v. *State Board of Elections, supra,* at 551 (20 days). To require preclearance of Rule 58 follows directly from our previous recognition that § 5 must be given "the broadest possible scope," *Allen* v. *State Board of Elections, supra,* at 567, encompassing the "subtle, as well as the obvious," forms of discrimination. 393 U. S., at 565. Informed by similarly expansive legislative and administrative understandings of the perimeters of § 5, we hold that obstacles to candidate qualification such as the Rule involved here are "standard[s], practice[s], or procedure[s] with respect to voting."

### III

Section 5 applies to all changes affecting voting made by "political subdivision[s]" of States designated for coverage pursuant to § 4 of the Act. Although acknowledging that the Board is a political subdivision under state law,[13] appellants contend that it does not meet the definition of that term as employed in the Voting Rights Act. They rely on § 14 (c)(2) of the Act, 79 Stat. 445, 42 U. S. C. § 1973*l* (c)(2), which defines "political subdivision" as

"any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting."

Because the Board is neither a county, parish, nor entity

---

their professional responsibilities. See Ga. Code § 32–2101c (1975); *Ransum* v. *Chattooga County Board of Education,* 144 Ga. App. 783, 242 S. E. 2d 374 (1978). What it may not do is adopt a rule that explicitly and directly burdens the electoral process without preclearance.

[13] See Ga. Code §§ 32–901, 23–1716 (1975); *Campbell* v. *Red Bud Consolidated School Dist.,* 186 Ga. 541, 548, 198 S. E. 225, 229 (1938); *Ty Ty Consolidated School Dist.* v. *Colquitt Lumber Co.,* 153 Ga. 426, 427, 112 S. E. 561 (1922).

which conducts voter registration, appellants maintain that it does not come within the purview of § 5.

This contention is squarely foreclosed by our decision last Term in *United States* v. *Board of Comm'rs of Sheffield,* 435 U. S. 110 (1978). There, we expressly rejected the suggestion that the city of Sheffield was beyond the ambit of § 5 because it did not itself register voters and hence was not a political subdivision as the term is defined in § 14 (c)(2) of the Act. Rather, the "language, structure, history, and purposes of the Act persuade[d] us that § 5, like the constitutional provisions it is designed to implement, applies to all entities having power over any aspect of the electoral process within designated jurisdictions . . . ." 435 U. S., at 118. Accordingly, we held that once a State has been designated for coverage, § 14 (c)(2)'s definition of political subdivision has no "operative significance in determining the reach of § 5." 435 U. S., at 126.

Appellants attempt to distinguish *Sheffield* on the ground that the Board, unlike the city of Sheffield, does not itself conduct elections. Since the Board has no direct responsibilities in conjunction with the election of public officials, appellants argue that it does not "exercise control" over the voting process, *id.,* at 127, and is not therefore subject to § 5.

*Sheffield* provides no support for such a cramped reading of the term "control." Our concern there was that covered jurisdictions could obviate the necessity for preclearance of voting changes by the simple expedient of "allowing local entities that do not conduct voter registration to control critical aspects of the electoral process." 435 U. S., at 125. We thus held that the impact of a change on the elective process, rather than the adopting entity's registration responsibilities, was dispositive of the question of § 5. coverage. Here, as the discussion in Part II, *supra,* indicates, a political unit with no nominal electoral functions can nonetheless exercise power

over the process by attaching a price tag to candidate participation. Appellants' analysis would hence achieve what *Sheffield* sought to avert; it would enable covered jurisdictions to circumvent the Act by delegating power over candidate qualification to local entities that do not conduct elections or voter registration. A State or political subdivision, by *de facto* delegation, "thereby could achieve through its instrumentalities what it could not do itself without preclearance." 435 U. S., at 139 (POWELL, J., concurring in judgment). If only those governmental units with official electoral obligations actuate the preclearance requirements of § 5, the Act would be "nullif[ied] . . . in a large number of its potential applications." 435 U. S., at 125 (footnote omitted).

Nothing in the language or purpose of the Act compels such an anomalous result. By its terms, § 5 requires preclearance whenever a political subdivision within a covered State adopts a change in a standard, practice, or procedure with respect to voting. No requirement that the subdivision itself conduct elections is stated in § 5 and none is fairly implied.[14] As this Court has observed, § 5 of the Voting Rights Act reflects Congress' firm resolve to end "the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century." *South Carolina* v. *Katzenbach*, 383 U. S., at 308. Whether a subdivision adopting a potentially discriminatory change has some nominal electoral functions bears no relation to the purpose of § 5. That provision directs attention to the impact of a change on the electoral process, not to the duties of the political subdivision

---

[14] Section 4 (a) makes continued coverage under the Act turn on whether discriminatory tests or devices have been used "anywhere in the territory" of a State or political subdivision for a prescribed number of years. 79 Stat. 438, as amended, 42 U. S. C. § 1973b (a). In *Sheffield,* we concluded that the territorial reach of the substantive requirements of § 5 was meant to be coterminous with the jurisdictional provisions of § 4 (a). 435 U. S., at 120–129.

that adopted it. To make coverage under § 5 turn on whether the State has confided in the Dougherty County Board of Education some formal responsibility for the conduct of elections, when the Board clearly has the power to affect candidate participation in those elections, would serve no purpose consonant with the objectives of the federal statutory scheme.

Nor would appellants' interpretation of § 5 comport with any ascertainable congressional intent. The legislative history of the 1975 extension, the statute which is controlling here, leaves no doubt but that Congress intended all electoral changes by political entities in covered jurisdictions to trigger federal scrutiny. Both the supporters and opponents of the proposed extension appear to have shared the common understanding that under § 5 no covered jurisdiction may enforce a change affecting voting without obtaining prior approval. See Hearings on S. 407 et al. before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 75–76 (1975) (testimony of Arthur Flemming, Chairman of the U. S. Commission on Civil Rights) (e. g., § 5 applies "to changes in voting laws, practices, and procedures that affect every stage of the political process"); Hearings on H. R. 939 et al. before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Cong., 1st Sess., 19 (1975) (testimony of Arthur Flemming); 121 Cong. Rec. 23744 (1975) (remarks of Sen. Stennis) ("Any changes, so far as election officials [are] concerned, which [are] made in precincts, county districts, school districts, municipalities, or State legislatures . . . [have] to be submitted"); id., at 24114 (remarks of Sen. Allen). Moreover, both the House and Senate Committees and witnesses at the House and Senate hearings referred to § 5's past and prospective application to school districts. See, e. g., 121 Cong. Rec. 23744 (1975) (remarks of Sen. Stennis); Hearings on S. 407, supra, at 467–470 (testimony of George Korbel, EEOC Regional Attorney); Hearings on H. R. 939,

*supra,* at 387–390 (testimony of George Korbel); S. Rep. 27–28; H. R. Rep. 19–20. Yet none of these discussions suggests that direct supervision of elections by a school board is a prerequisite to its coverage under the Act. To the contrary, a fair reading of the legislative history compels the conclusion that Congress was determined in the 1975 extension of the Act to provide some mechanism for coping with all potentially discriminatory enactments whose source and forms it could not anticipate but whose impact on the electoral process could be significant. Rule 58 is such a change.

Because we conclude that Rule 58 is a standard, practice, or procedure with respect to voting enacted by an entity subject to § 5, the judgment of the District Court is

*Affirmed.*

MR. JUSTICE STEWART dissents for the reasons expressed in Part I of the dissenting opinion of MR. JUSTICE POWELL.

MR. JUSTICE STEVENS, concurring.

Although I remain convinced that the Court's construction of the statute does not accurately reflect the intent of the Congress that enacted it, see *United States* v. *Board of Comm'rs of Sheffield,* 435 U. S. 110, 140–150 (STEVENS, J., dissenting), MR. JUSTICE MARSHALL has demonstrated that the rationale of the Court's prior decisions compels the result it reaches today. Accordingly, I join his opinion for the Court.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

Today the Court again expands the reach of the Voting Rights Act of 1965, ruling that a local board of education with no authority over any electoral system must obtain federal clearance of its personnel rule requiring employees to take leaves of absence while campaigning for political office. The Court's ruling is without support in the language or legislative history of the Act. Moreover, although prior decisions

of the Court have taken liberties with this language and history, today's decision is without precedent.

## I

### *Standard, Practice, or Procedure*

Section 5 requires federal preclearance before a "political subdivision" of a State covered by § 4 of the Act may enforce a change in "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting . . . ." This provision marked a radical departure from traditional notions of constitutional federalism, a departure several Members of this Court have regarded as unconstitutional.[1]  Indeed, the Court noted in the first case to come before it under the Act that § 5 represents an "uncommon exercise of congressional power," *South Carolina* v. *Katzenbach*, 383 U. S. 301, 334 (1966), and the Justice Department has conceded in testimony before Congress that it is a "substantial departure . . . from ordinary concepts of our federal system."  Hearings on S. 407 et al. before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 536 (1975) (testimony of Stanley Pottinger, Asst. Atty. Gen., Civil Rights Division).

Congress tempered the intrusion of the Federal Government into state affairs, however, by limiting the Act's coverage to voting regulations.  Indeed, the very title of the Act shows

---

[1] Mr. Justice Black believed that the preclearance requirement of § 5 "so distorts our constitutional structure of government as to render any distinction drawn in the Constitution between state and federal power almost meaningless."  See *South Carolina* v. *Katzenbach*, 383 U. S. 301, 358 (1966) (concurring and dissenting opinion).  Other Members of the Court also have expressed misgivings.  See *Allen* v. *State Board of Elections*, 393 U. S. 544, 586, and n. 4 (1969) (Harlan, J., concurring and dissenting); *Holt* v. *Richmond*, 406 U. S. 903 (1972) (BURGER, C. J., concurring); *Georgia* v. *United States*, 411 U. S. 526, 545 (1973) (POWELL, J., dissenting).  But decisions of the Court have held the Act to be constitutional.

that the Act's thrust is directed to the protection of voting rights. Section 2 forbids the States to use any *"voting* qualification or prerequisite to *voting,* or standard, practice, or procedure" (emphasis added) to deny anyone the right to vote on account of race. Similarly, § 4 sharply curtails the rights of certain States to use "tests or devices" as prerequisites to voting eligibility. "[T]est or device" is defined in § 4 (c), 42 U. S. C. § 1973b (c), as

> "any requirement that a person as a prerequisite for *voting* or registration for *voting* (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." (Emphasis added.)

Finally, § 5 requires preclearance only of "any *voting* qualification or prerequisite to *voting,* or standard, practice, or procedure with respect to *voting"* (emphasis added).[2]

The question under this language, therefore, is whether Rule 58 of the Board pertains to voting. Contrary to the suggestion of the Court's opinion, see *ante,* at 42–43, the answer to this question turns neither on the Board's possible discrimination against the appellee, nor on the potential of enactments such as Rule 58 for use as instruments of racial discrimination. Section 5 by its terms is not limited to enact-

---

[2] In § 14 (c) (1) of the Act, 42 U. S. C. § 1973*l* (c) (1), the terms "vote" and "voting" are defined to

"include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this subchapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election."

50

ments that have a potential for discriminatory use; rather, it extends to all regulations with respect to voting, regardless of their purpose or potential uses. The affected party's race was conceded by counsel to be irrelevant in determining whether Rule 58 pertains to voting, see Tr. of Oral Arg. 25–27; nor is the timing of the adoption of Rule 58 of any significance. Indeed, in stating his cause of action under the Act, the appellee does not allege any discrimination on the basis of race.[3] Yet the Court, in holding that Rule 58 is subject to the preclearance requirements of § 5, relies on a perceived potential for discrimination. In so doing, the Court simply disregards the explicit scope of § 5 and relies upon factors that the parties have conceded to be irrelevant.[4]

---

[3] Appellee's first cause of action alleged only:

"The actions of the defendants complained of herein are in violation of the Voting Rights Act of 1965, 42 U. S. C. Sec. 1971, et seq., in that defendants have instituted a 'voting qualification or prerequisite to vote, or standard, practice or procedure with respect to voting different from that in force or effect on November 1, 1964' without submitting or obtaining the required approval of either the United States Attorney General or the United States District Court for the District of Columbia, as required by Section Five of the Voting Rights Act of 1965. Defendants are a 'covered jurisdiction' within the meaning of the Voting Rights Act."

The appellee also set forth claims under the Fourteenth and Fifteenth Amendments and under 42 U. S. C. § 1983. Under these causes of action, the appellee alleged discrimination on the basis of race. The appellee's race and the timing of Rule 58's adoption by the Board may be probative in establishing whether the Board acted unconstitutionally in enacting Rule 58. But these causes of action were not addressed by the District Court and are not before us.

[4] To be sure, the purpose of the Voting Rights Act was to "banish the blight of racial discrimination in voting" in selected States. See South Carolina v. Katzenbach, supra, at 308. To this end, Congress imposed an unlimited proscription on activities affecting the voting rights of others by making it a crime under § 11 of the Act for anyone to "intimidate, threaten, or coerce any person for voting . . . or for urging . . . any person to vote." 42 U. S. C. § 1973i (b). Unlike § 5, § 11 is not

Separated from all mistaken references to racial discrimination, the Court's holding that Rule 58 is a "standard, practice, or procedure with respect to voting" is difficult to understand. It tortures the language of the Act to conclude that this personnel regulation, having nothing to do with the conduct of elections as such, is state action "with respect to voting." No one is denied the right to vote; nor is anyone's exercise of the franchise impaired.

To support its interpretation of § 5, the Court has constructed a tenuous theory, reasoning that, because the right to vote includes the right to vote for whoever may wish to run for office, any discouragement given any potential candidate may deprive someone of the right to vote. In constructing this theory, *ante*, at 41, the Court relies upon *Bullock* v. *Carter*, 405 U. S. 134 (1972); *Hadnott* v. *Amos*, 394 U. S. 358 (1969); and *Allen* v. *State Board of Elections*, 393 U. S. 544 (1969)—cases that involved explicit barriers to candidacy, such as the filing fees held to violate the Fourteenth Amendment in *Bullock*. The Court states that the "reality here is that Rule 58's impact on elections is no different from that of many of the candidate qualification changes for which we have previously required preclearance." *Ante*, at 41. But the notion that a State or locality imposes a "qualification" on candidates by refusing to support their campaigns with public funds is without support in reason or precedent.

As no prior § 5 decision arguably governs the resolution of this case, the Court draws upon broad dictum that, taken from

limited to devices identifiable as voting regulations. On the other hand, § 2 does not deal with every voting standard, practice, or procedure, but rather is limited to voting procedures that deny someone the right to vote. Thus, although Congress had but one purpose, it used different methods to reach its ends. Under § 5, Congress required preclearance of *all* changes in voting laws—irrespective of their intent, effect, or potential use.

its context, is meaningless.[5]  For example, in *Allen* v. *State Board of Elections, supra,* at 566, the Court suggested that § 5 would require clearance of "any state enactment which alter[s] the election law of a covered State in even a minor way." Even if the language in *Allen* were viewed as necessary to the Court's holding in that case, it would not support today's decision.  In *Allen,* as in each of the cases relied upon today,[6]

---

[5] The Court also relies upon the Attorney General's interpretation of the Act for its holding today. See *ante,* at 39–40.  Thus, the Court quotes language in the Attorney General's regulations that "[a]ny alteration affecting the eligibility of persons to become or remain candidates . . ." must be precleared.  *Ante,* at 39.  Nothing in Rule 58, however, affected the appellee's *eligibility* to become or remain a candidate for the Georgia House of Representatives.  As the Attorney General's regulations do not state with specificity whether a personnel rule concerning wages paid to candidates is a regulation "with respect to voting" under § 5, these regulations are of no assistance in the case at hand.  Although the Attorney General now demands that Rule 58 be cleared, there is no indication that this action accords with a longstanding policy of the Justice Department.  Indeed, the Solicitor General admits that "the Attorney General has had little experience with provisions such as [the] appellant[s'] . . . Rule 58." See Brief for United States as *Amicus Curiae* 14. Under these circumstances, the Court's purported deference to the Attorney General's position—apparently voiced for the first time in this case— is a makeweight.

[6] The actions presented to the Court in *Allen* were a decision to change from district to at-large elections, an enactment to make the Superintendent of Schools an appointive position, and a stiffening of the qualifications required of independent candidates.  See *Allen* v. *State Board of Elections,* 393 U. S., at 550–552.  Similarly, the other cases to which the Court alludes involved voting regulations: *Richmond* v. *United States,* 422 U. S. 358 (1975) (annexation); *Georgia* v. *United States,* 411 U. S. 526 (1973) (reapportionment); *Petersburg* v. *United States,* 410 U. S. 962 (1973) (annexations); *Perkins* v. *Matthews,* 400 U. S. 379 (1971) (annexation and redistricting); *Hadnott* v. *Amos,* 394 U. S. 358 (1969) (requirements for independent candidates).  Because *Allen* and its progeny involved only enactments directly pertaining to voting regulation, the implicit ratification of these decisions by Congress in 1970 and 1975 has no bearing on the case at hand.

the Court was considering an enactment relating directly to the way in which elections are conducted: either by structuring the method of balloting, setting forth the qualifications for candidates, or determining who shall be permitted to vote. These enactments could be said to be "with respect to voting" in elections. Rule 58, on the other hand, effects no change in an election law or in a law regulating who may vote or when and where they may do so. It is a personnel rule directed to the resolution of a personnel problem: the expenditure of public funds to support the candidacy of an employee whose time and energies may be devoted to campaigning, rather than to counseling schoolchildren.

After extending the scope of § 5 beyond anything indicated in the statutory language or in precedent, the Court attempts to limit its holding by suggesting that Rule 58 somehow differs from a "neutral personnel practice governing all forms of absenteeism," as it "specifically addresses the electoral process." See *ante,* at 40. Thus, the Court intimates that it would not require Rule 58 to be precleared if the rule required Board employees to take unpaid leaves of absence whenever an extracurricular responsibility required them frequently to be absent from their duties—whether that responsibility derived from candidacy for office, campaigning for a friend who is running for office, fulfilling civic duties, or entering into gainful employment with a second employer. The Court goes on, however, to give as the principal reason for extension of § 5 to Rule 58 the effect of such rules on potential candidates for office. What the Court fails to note is that the effect on a potential candidate of a "neutral personnel practice governing all forms of absenteeism" is no less than the effect of Rule 58 as enacted by the Dougherty County School Board. Thus, under a general absenteeism provision the appellee would go without pay just as he did under Rule 58; the only difference would be that Board employees absent for reasons other than their candidacy would join the appellee on leave.

Under the Court's rationale, therefore, even those enactments making no explicit reference to the electoral process would have to be cleared through the Attorney General or the District Court for the District of Columbia. Indeed, if the Court truly means that any incidental impact on elections is sufficient to trigger the preclearance requirement of § 5, then it is difficult to imagine what sorts of state or local enactments would *not* fall within the scope of that section.[7]

## II

### *Political Subdivision*

Section 5 requires federal preclearance only of those voting changes that are adopted either by a State covered under § 4 or by a "political subdivision" of such a State. Although § 14 (c)(2) of the Act restricts the term "political subdivision" to state institutions that "conduc[t] registration for voting," last Term the Court ruled that the preclearance requirement of § 5 applied to the city of Sheffield, Ala., which is without authority to register voters. See *United States* v. *Board of*

---

[7] Little imagination is required to anticipate one possible result of today's decision: In States covered by the Act, public employees at every level of state government may "declare their candidacy" for elective office, thereby avoiding their duties while drawing their pay. It will be answered, of course, that personnel regulations adopted to close this "loophole" can be submitted to the Attorney General for his approval. Indeed, the Government's *amicus* brief in this case appears to foreclose the possibility that the Department of Justice would rule these trivialities to be proscribed by the Act. There are thousands of local governmental bodies, however: school boards, planning commissions, sanitary district commissions, zoning boards, and the like. Many of these may choose the easier course of allowing employees this privilege at the taxpayers' expense, rather than going through the unwelcome and often frustrating experience of clearing each personnel regulation through the federal bureaucracy. Even if most of these bodies eventually will prevail in implementing their regulations, the fact that they may do so only at sufferance of the Federal Government runs counter to our most basic notions of local self-government. See n. 1, *supra*.

*Commissioners of Sheffield,* 435 U. S. 110 (1978). Sheffield had been given authority, however, to undertake a substantial restructuring of the method by which its government officials would be selected.[8] Thus, pursuant to a voter referendum, Sheffield had changed from a commission to a mayor-council form of government. Councilmen were to be elected at large, but would run for numbered seats corresponding to the two council seats given each of the city's four wards.

The Court held that Sheffield was a political subdivision, in spite of its lack of authority to register voters. Today the Court states that appellants' "contention is squarely foreclosed by our decision last Term" in *Sheffield.* *Ante,* at 44. The contention that this local school board is not a political subdivision under the Act is foreclosed only because the Court now declares it to be so, as neither the holding nor the rationale of *Sheffield* applies to this case. The *Sheffield* decision was based on two grounds, neither of which is present here. First, the *Sheffield* Court relied upon "congressional intent" as derived from "the Act's structure," "the language of the Act," "the legislative history of . . . enactment and re-enactments," and "the Attorney General's consistent interpretations of § 5." 435 U. S., at 117–118. Second, the Court based its decision on the frustration of the Act's basic policy that would result if a State could circumvent the Act's provisions by simply withdrawing the power to register voters from all or selected cities, counties, parishes, or other political subdivisions.[9]

---

[8] See Ala. Code, Tit. 11, §§ 44–150 to 44–162 (1975).

[9] I joined in the judgment of the Court in *Sheffield* for similar reasons: "I believe today's decision to be correct under this Court's precedents and necessary in order to effectuate the purposes of the Act, as construed in *Allen* and *Perkins.* In view of these purposes it does not make sense to limit the preclearance requirement to political units charged with voter registration. . . . [S]uch a construction of the statute would enable covered States or political subdivisions to allow local entities that do not

There is nothing in the language, structure, or legislative history of the Act that suggests it was Congress' intent that local entities such as the Board were to fall within the reach of § 5; nor has the Court cited any "consistent interpretation" of § 5 by the Attorney General that supports the Court's holding.[10] Looking to the structure of the Act, the Court argues that whether a subdivision has electoral responsibilities is of no consequence in determining whether § 5 is applicable. *Ante*, at 45–46. Rather, it is said that this provision "directs attention to the impact of a change on the electoral process, not to the duties of the political subdivision that adopted it." *Ibid.* Neither *Sheffield* nor any other decision of the Court suggests that § 5 applies to the actions of every local entity however remote its powers may be with respect to elections and voting. Indeed, the Court indicated the importance of direct power over elections in *Sheffield* when it repeatedly emphasized Sheffield's "power over the electoral process." [11]

---

conduct voter registration to assume responsibility for changing the electoral process. A covered State or political subdivision thereby could achieve through its instrumentalities what it could not do itself without preclearance." 435 U. S., at 139.

[10] Indeed, in discussing whether the Dougherty County Board of Education is a "political subdivision" covered by § 5, the Court makes no reference whatsoever to any interpretation of the Act by the Attorney General. Thus, what the Court found to be a "compelling argument" for extending the preclearance requirement to the city of Sheffield, see *Sheffield*, 435 U. S., at 131, is wholly absent here.

[11] In relying upon the Act's structure for its interpretation of § 5, the Court in *Sheffield* made much of the scope of § 4 (a) and the need to read § 5 "in lock-step with § 4." See 435 U. S., at 122 (quoting *Allen* v. *State Board of Elections,* 393 U. S., at 584 (Harlan, J., concurring and dissenting)). Thus, the Court concluded that § 5 must apply to any entity with control over the electoral system, because § 4 (a) proscribes the use of literacy tests and similar devices, and any entity with control over the electoral system could use such devices. Under this analysis, the Board should not come within the scope of § 5, as it has no power to use a test or device to deprive anyone of the right to vote.

See, *e. g.*, 435 U. S., at 118, 120, 122, 127. A rational application of *Sheffield* would require consideration of whether the entity enacting a change had a substantial measure of authority over the way in which elections were held or over the right to vote. The city of Sheffield had such authority; the Dougherty County School Board does not.

Although professing to find support in the legislative history of the Act, the Court cites no committee report or statement by any supporter of the Act that suggests a congressional intention to require federal preclearance of actions by local entities that are powerless to exercise any control over elections or voting. The Court does try to connect § 5 to school boards by references to legislative history that are entirely irrelevant. The Court neglects to make clear that each of these references pertained to a school board enacting changes in the way its members were elected, something the Dougherty County School Board is without authority to do.[12] See 121 Cong. Rec. 23744 (1975) (remarks of Sen. Stennis) ("Any changes, so far as election officials were concerned, which were made in precincts, county districts, school districts, municipalities, or State legislatures . . . had to be submitted"); Hearings on S. 407 et al. before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 467–470 (1975) (school board enacting changes from ward to at-large elections for its members); S. Rep. No. 94–295, p. 27 (1975) (school boards in Texas adopting "[e]lection law changes" to avoid election of minority groups to school boards).

---

[12] The Dougherty County Board of Education has no authority over any aspect of an electoral system. The Georgia State Constitution charges the Board with administering the public school system within Dougherty County, Georgia. See Ga. Code § 2–5302 (Supp. 1977). The five members of the Board are appointed by the County Grand Jury for terms of five years, and have powers limited to establishing and maintaining a public school system.

Furthermore, the *Sheffield* Court's concern over the possible circumvention of the Act is inapposite here, as the Board (unlike the city of Sheffield) has no authority to regulate the electoral process. There can be no danger, therefore, that substantial restructuring of the electoral system will take place in Dougherty County without the scrutiny of either the Attorney General or the District Court for the District of Columbia.

Thus, none of the factors relied upon in *Sheffield* is present in this case: There is no relevant "language of the Act," nothing in the "Act's structure," nothing in its "legislative history," and no "consistent interpretation of § 5" by the Attorney General to support the extension of § 5 to the Board's enactments. Nor is it possible that a local school board that is without authority over the electoral process will be used to circumvent the Act's basic policy. There simply is no parallel in fact or governmental theory between a city like Sheffield and the Dougherty County School Board.

Finding no support for its decision in the rationale of *Sheffield*, the Court falls back upon language in that opinion that "all entities having power over any aspect of the electoral process" are subject to § 5—language merely expressing a conclusion drawn from a consideration of the factors present in *Sheffield*, but absent here.[13] The Board has no "power over any aspect of the electoral process" in the normal sense of these words. It did not purport by Rule 58 to regulate the appellee's election to the Georgia House of Representatives;

---

[13] Today the Court concludes that any state entity empowered to adopt "potentially discriminatory enactments" with an effect on elections is a "political subdivision" for purposes of the Act. The Court also construes every such potentially discriminatory enactment to be a "standard, practice, or procedure" under § 5. Thus, although the Court professes to be deciding two different questions, it telescopes them into one: Every entity empowered to enact a standard, practice, or procedure with respect to voting (that is, a regulation that may be viewed as potentially discriminatory) by definition is a political subdivision subject to § 5.

it has been given no authority under Georgia law to do so. Rather, the Board merely has said to its employees that, if they choose to run for any elective office, the Board will not affirmatively support their campaign by paying their wages despite the neglect of their duties that inevitably will occur. Such neutral action designed to protect the public fisc hardly rises to the level of "power over . . . the election process."

In sum, I would reverse the judgment below on either or both of two grounds. The Dougherty County School Board is not a "political subdivision" within the meaning of the Act. Even if it were deemed to be such, the personnel rule at issue is not a standard, practice, or procedure "with respect to voting." As respectful as I am of my Brothers' opinions, I view the Court's decision as simply a judicial revision of the Act, unsupported by its purpose, statutory language, structure, or history.