**David JORDAN, Plaintiff,**

v.

**Dr. J. Robert CAGLE, Jr., Superintendent of Education et al., Defendants.**

No. GC 79–103–K–O.

United States District Court,
N. D. Mississippi,
Greenville Division.

July 19, 1979.

Alix H. Sanders, Willie J. Perkins, Greenwood, Miss., for plaintiff.

Hardy Lott, Greenwood, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this case, David Jordan, plaintiff, sues the superintendent and members of the board of trustees of the Greenwood Municipal Separate School District individually and in their official capacities as defendants, alleging causes of action under 42 U.S.C. § 1983 and 42 U.S.C. § 1973 et seq., that the failure by the defendants to rehire him as a science teacher in the W. C. Williams School for the school year 1979–80 was violative of his rights protected by the first, fifth and fourteenth amendments to the Constitution of the United States. Federal court jurisdiction is invoked under 28 U.S.C. § 1343(3), (4) and 42 U.S.C. § 1973 et seq. Defendants by their joint answer denied that the failure to rehire plaintiff for the upcoming school year infringed upon federally protected rights of the plaintiff; that the plaintiff, upon his request, had been granted a hearing before the school board; that prior to the hearing, which was held on May 7, 1979, plaintiff and his counsel were furnished, pursuant to their request, a statement of the reasons for the nonrehire, a list of the witnesses and a summary of their testimony regarding the basis for the decision not to rehire; that the hearing before the school board was conducted from May 7 through May 9; that the testimony offered before the board was taken down by a court reporter and duly transcribed; that at the conclusion of the hearing written findings were made by the board upholding the decision of the superintendent not to rehire plaintiff for the school year 1979–80.

Plaintiff, on June 8, moved for a temporary restraining order or, in the alternative, a preliminary injunction for his reinstatement as a public school teacher. Affidavits in support of and in opposition to the motion were filed with the court. On July 6, the court conducted an evidentiary hearing on the application for injunctive relief, at the conclusion of which counsel for both sides, the court consenting thereto, agreed that the case could be treated as if it were before the court on final hearing in accordance with Rule 65(a)(2), F.R.Civ.P. The parties introduced oral and documentary evidence at the hearing and submitted to the court oral arguments as well as memorandum briefs. The court entered a temporary restraining order against the defendants not to fill the teaching position formerly held by plaintiff, the vacancy not having yet been filled, until the court made a final determination on the merits. At this time the court finds that the case is ripe for disposition on the merits and incorporates herein findings of fact and conclusions of law as required by Rule 52.

## I. FACTS

Much of the evidence is undisputed. Plaintiff, the holder of a master's degree in chemistry and a AA teaching certificate, taught 7th and 8th grade science for eight years in the W. C. Williams School under Ward Jackson, principal of the Williams School. In addition to his teaching duties, Jordan had for years been active in politics, was a member and president of the Voters League and had assumed leadership roles in the black community protesting various manifestations of racial discrimination that allegedly prevailed in Greenwood. In the spring of 1979, Jackson recommended plaintiff for rehire. However, Dr. Robert Cagle, superintendent, did not concur and did not include plaintiff in the list of recommendations for employment for the new school year. Instead, on April 6, Cagle notified plaintiff that he had not recommended him for rehire and that he would not be offered a teaching contract for the new school year. In this communication Cagle pointed out that plaintiff was entitled to a hearing if he made a timely request, and enclosed with his letter a copy of the board's policy concerning "The School Employment Procedures Act for Professional Personnel." On April 9, the superintendent received from plaintiff's retained counsel a letter requesting a hearing on the superintendent's action and demanding written notice of reasons for his decision together with a summary of the factual basis therefor, the names and summarized statements of witnesses and

copies of all documents or statements which might be presented against plaintiff at the school board hearing, together with an evaluation of his performance. On May 1, the superintendent replied to plaintiff's counsel advising that a hearing would be granted plaintiff on May 7, at which time the board would be present and would decide the issue on the evidence presented at the hearing, and that Hite McLean, a practicing attorney of Greenwood, not connected with the school board, had been designated as the hearing officer to preside at the meeting. The superintendent appended as Exhibit A to his letter the reasons that he did not recommend plaintiff for rehire. The stated reasons as set forth verbatim below [1] may be briefly summarized as follows:

1. 1. Mr. David Jordan signed and filed with the School District an application dated August 15, 1975, for free lunches for his son, Donald Jordan, a student at Greenwood High School, a school of the School District, and a photostatic copy of which application is attached hereto. At the time of the filing of the application there were six members of Mr. Jordan's family and the maximum gross income the family could have and still be entitled to free lunches for a child was $8,110.00. The application stated that there were six in the family and that the total family income before deductions was $8,000.00 a year. At that time, both Mr. Jordan and his wife, Mrs. Christine Jordan, were employed as teachers in the School District system for the school year 1975–76, and their combined salaries as such teachers for said year were in excess of $20,000.00 per year and were approximately $20,674.00. On account of this application, Donald Jordan received free lunches until the Board of Trustees of School District made an investigation of the matter and stopped him receiving free lunches. By reason of his employment with the School District, Mr. Jordan was familiar with the requirements with reference to children getting free lunches and he knew that his son, Donald Jordan, was not entitled to be served free lunches.

2. On or shortly before October 24, 1978, and in any event in October 1978, David Jordan signed and gave to the principal of the school where he taught a statement that he would be absent from school October 25 and 26 for the purpose of going to the White House and that "I plan to use my personal days". A copy of this statement is attached hereto. A personal leave day is referred to in the School District as a "C" day.

On October 24, 1978, while Dr. J. Robert Cagle, the Superintendent of the School District, was absent from the City of Greenwood, Mississippi, Mr. David Jordan came to Dr. Cagle's office and in an angry and rude manner waived [sic] a paper at Dr. Cagle's secretary, Mrs. Brenda Hurst, and demanded in an angry manner to know who had decided that he, Jordan, should be "docked" for going to Washington and insisted that she, Mrs. Hurst, had assumed the authority to do this. Mrs. Hurst explained to Mr. Jordan that the Superintendent was out of town but had telephoned that Mr. Jordan was to be excused to go to Washington; that she, Mrs. Hurst, assumed that, since Mr. Jordan's statement with reference to his absence stated that he planned to use his personal days, it would be coded a "C" day, but that no one could decide this except Dr. Cagle on his return. Thereafter, Mr. Jordan stayed in the office a considerable length of time and continued to waive [sic] the paper at Mrs. Hurst, to point his finger at her and in a harsh, mean and angry tone of voice insist that she had assumed the authority to have his absence coded as a "C" day.

3. Mr. David Jordan requested of the principal of the school where he taught, Mr. Ward Jackson, that he, Mr. Jordan, be excused from his teaching duties at school on November 7, 1978, in order that he could work that day at the election polls. Mr. Jordan had used up all of his personal leave days and did not at that time have a personal leave day that he could take so as to be absent from his work on November 7, 1978. Mr. Jordan's request that he be permitted to be absent from his work for the School District the day of November 7, 1978, was refused, and Mr. David Jordan was informed by his principal, Ward Jackson, of this refusal. Nevertheless, Mr. David Jordan absented himself from his teaching duties the day of November 7, 1978, in violation of the instructions from his superiors that he not do so.

The policy of the School District with reference to personal leave and absences and non-school employment as stated in the teachers handbook of the School District is attached hereto.

3A. Mr. David Jordan's above mentioned request to the principal of the school where he taught that he be excused from his teaching duties at school on November 7, 1978, so that he could work that day at the election polls was oral and was not in writing as required by school policy set forth in the teacher's handbook of the school district, a copy of which policy as it appeared in the teacher's handbook being attached hereto, and the failure to make said request in writing was a violation of the instructions of the school district set forth in said statement of policy.

4. On November 6, 1978, Mr. Jordan appeared on television on Station WABG of Greenwood, Mississippi and recklessly and falsely stated in substance, among other things, that after the Voters League of which he was

President had endorsed a Mr. Evers as a candidate for the United States Senate, the School Board had met and ruled that no teacher in the City of Greenwood could work in an election, that this was a racist act, and that they are intimidating black teachers in the Greenwood School system "just because I plan to be off"; that the alleged ruling was "racially motivated"; that "the School Board made this ruling along with the recommendations of Dr. Robert Cagle, who I consider to be one that is against black teachers in this town and in this area to not allow any teachers to work at the poll because he is adamantly against the Voters League endorsement"; that the ruling was made to interfere with the endorsement by the Voters League of Mayor Charles Evers, and "we are going to take action against them." A copy of Mr. Jordan's remarks on the above occasion is attached hereto.

The fact is that the act of the Board of Trustees and Superintendent in refusing Mr. Jordan's request that he be excused from his teaching duties to work at the election was done before the Voters League endorsed Mayor Charles Evers (and not afterward as stated by Mr. Jordan) and the refusal to excuse him from his work was not in any way caused by or connected with any endorsement of Mayor Evers or any political activity of Mr. David Jordan.

The refusal to excuse Mr. Jordan from his work the day of November 7, 1978, was not a racist act, was not racially motivated, Dr. Cagle is not against black teachers, and Dr. Cagle was not against any Voter League endorsement.

5. The School Board policy as stated in the teachers handbook of the School District states:

"The Board shall listen to grievances of any person or persons who have followed the proper channels. The aggrieved party should first contact his/her immediate supervisor and if the results are unsatisfactory, go to the Superintendent. If the meeting with the Superintendent does not prove satisfactory, the aggrieved person, or persons, may then request a hearing before the Board through the Superintendent."

"It is very important for any organization, in order to function properly and effectively, that personnel follow the chain of command."

Mr. David Jordan violated this School Board policy by not requesting a meeting with either the Superintendent of the School District or the School Board with reference to his alleged grievance. Instead, without requesting such meeting, he made the above mentioned untrue accusations on television as hereinabove set forth.

6. On November 13, 1978, Mr. David Jordan came to a meeting of the School Board, accompanied by a large number of black citizens including some teachers in the schools of the School District, and there publicly made accusations about his not having been excused to work at the polls on November 7, 1978. After being told in this meeting by Dr. Cagle that he, Mr. David Jordan, did not have any unused personal leave days that he could use to be absent on November 7, Mr. Jordan proceeded in an angry and rude manner to publicly and falsely state in substance that the Superintendent's refusal to excuse him on November 7, 1978, was based on the Voters League decision to endorse Charles Evers for the Senate race, that Dr. Cagle was a racist, was insensitive to the needs of blacks and discriminated against him (Jordan) personally, that "we will not be pushed around like children" and that he would "turn this town upside down" if necessary to carry his point.

The decision to refuse to excuse Mr. Jordan from his work was made at a School Board meeting held before the Voters League endorsed Charles Evers, and no endorsement had any connection with the refusal of Mr. Jordan's request.

Dr. Cagle is not a racist, is not insensitive to the needs of blacks, and has not discriminated against David Jordan.

7. On December 31, 1978, there was published in the Greenwood Commonwealth, a newspaper published and circulated in Greenwood, Mississippi, an article under the byline of Harry Merritt, a staff writer for said newspaper, stating in part the following:

"Speaking of Cagle's alleged failure to consider the needs of black students and teachers, David Jordan, a science teacher who heads the Voters League, said of the Georgia born Superintendent 'we'll either have to discipline him or put him back on one of those long midnight trains to Georgia.' "

Mr. David Jordan had made the above quoted statement to Mr. Merritt and caused or permitted it to be published in the said newspaper.

8. Mr. David Jordan has publicly demanded the immediate resignation of Dr. Cagle as Superintendent of the School District and has stated publicly that Dr. Cagle "must go".

9. At a meeting called by leaders of the Greenwood-Leflore Chamber of Commerce for the purpose of trying to settle differences between David Jordan and the Greenwood Municipal Separate School District held January 23, 1979, at the Chamber of Commerce building in Greenwood, Mississippi, attended by leaders in the Chamber of Commerce, by members and officials of the Greenwood Voters League and by the School Board and Dr. J. Robert Cagle, Mr. David Jordan, at or near the end of the meeting, stated loudly and emphatically to Dr. Cagle and all others present that Dr. Cagle was not representative of the blacks and that Dr. Cagle "must go" as Superintendent of the schools, and in an angry manner he demanded that Dr. Cagle resign as Superintendent of the school system; and all of this was said by David Jordan without any provocation of any kind from Dr. Cagle.

1. Plaintiff had in August 1975 misrepresented his income in order to obtain free lunches for his son, Donald, then a student at Greenwood High School, since plaintiff's and his wife's combined incomes greatly exceeded the amount which would render their son eligible to receive lunches.[2]

2. About October 24, 1978, plaintiff informed his principal in writing that he would be absent from school on October 25 and 26 for the purpose of attending a White House conference called by President Carter, stating that he planned to use his days for personal leave; on the same day, plaintiff went to the superintendent's office and angrily accosted his secretary, Mrs. Hurst, demanding to know who had decided that he should be "docked" for going to Washington. Plaintiff, not being satisfied with Mrs. Hurst's reply, "pointed a finger" at her and "in a harsh, mean and angry voice" insisted that she had wrongfully assumed the authority to have his absence coded as a "C" day.[3]

3. Plaintiff requested orally of his principal that he be excused from his teaching duties on November 7, 1978, to work that day at the election polls. Notwithstanding Jackson's approval, plaintiff was denied his request by the superintendent and told that he could not be absent from his work on election day. Cagle's denial was transmitted to plaintiff by the principal, but plaintiff absented himself from his teaching duties on election day contrary to the instructions of his superior. Additionally, Jordan's request of his principal was not in writing as required by the school board's policy contained in the teacher's handbook, and failure to make the request in writing was in itself a violation of school board policy.[4]

4. On November 6, the day before the election, plaintiff appeared on the Greenwood television station and made certain statements regarding the "racist" character of the superintendent's and board's actions. The superintendent stated that the actions were calculated to intimidate black teachers, and that the actions were motivated by the Voters League endorsement of Charles Evers as a candidate for the United States Senate in the November 7 election. All of these statements were broadcast by the television station. A verbatim copy of Jordan's remarks on TV was appended as an exhibit and appears at n. 5, *infra.*

5. The school board policy as contained in the teacher's handbook provided that any

10. The above mentioned course of conduct on the part of David Jordan in publicly criticizing and insulting Dr. J. Robert Cagle and demanding his resignation, has necessarily reduced the effectiveness of Dr. Cagle as Superintendent of the School District, particularly in performing his duty of directing the approximately 410 employees of the School District. Dr. Cagle's recommending David Jordan for further employment in said School District, after said David Jordan has made these statements and after David Jordan has refused to follow instructions, would have the effect of disrupting faculty discipline and further impairing and hampering Dr. Cagle's ability to direct the employees of the School District and operate the School District effectively, all of which will result in decreasing the efficiency of the School District.

2. The undisputed facts were that when this discrepancy was brought to plaintiff's attention by way of reprimand, he made restitution for the free lunches that his son Donald had received at the Greenwood High School. He was thereafter recommended and rehired in his regular position and continued as a member of the Williams School faculty until the current controversy arose. Plaintiff's version of the free lunch incident was that he had signed a paper in blank and did not fill out the contents and did not intend to misrepresent his financial status to the board since he and his wife both worked for the Greenwood School system and their total combined income was readily available and that he had another son at Threadgill Junior High School who had not received any free lunches. In any event, upon the board's reprimand and restitution, the incident was considered closed by all parties at the time.

3. In fact, coding as a "C" day would, under the board's regulations, result in a docking of $20 per day. Cagle upon his return coded these days as "E" days which, because of the educational value, resulted in no docking at all.

4. At the board hearing on May 8, 1979, plaintiff testified that he had submitted his request to his principal in writing. (Hearing Trans. May 8, p. 126). However, plaintiff acknowledged before this court that his request had in fact been presented orally.

party aggrieved must pursue proper channels by first contacting his immediate superior; if the results are unsatisfactory, he should proceed to the superintendent; if the superintendent does not resolve the grievances, the aggrieved party may then request a hearing before the board through the superintendent. Plaintiff allegedly violated school board policy by not requesting a meeting with Cagle to discuss his grievances for being denied a leave for election day and that without pursuing such procedures he appeared on TV in criticism of the school board and its superintendent.

6. Several days later, on November 13, 1978, plaintiff attended a meeting of the school board accompanied by a large number of black citizens including some teachers and publicly made accusations about not having been excused to work at the polls on election day. After being told in this meeting by the superintendent that plaintiff did not have unused personal leave days that he could use for such absence plaintiff angrily "publicly and falsely stated in substance that the superintendent's refusal to excuse him on November 7 was based on the Voters League's decision to endorse Charles Evers for the Senate race, that Dr. Cagle was a racist, was insensitive to the needs of blacks and discriminated against him [Jordan] personally, and that 'we will not be pushed around like children' and that he would 'turn this town upside down' if necessary to carry his point."

7. On December 31, 1978, an article appeared in the Greenwood Commonwealth, the local newspaper, quoting plaintiff as stating "we'll either have to discipline him [Dr. Cagle] or put him back on one of those long midnight trains to Georgia." (Dr. Cagle was a native of and had come from the State of Georgia to accept the Greenwood superintendency.)

8. Plaintiff publicly demanded in public meetings that Dr. Cagle "must go" as superintendent.

9. At a January 23, 1979, meeting called by the leaders of the Greenwood-Leflore County Chamber of Commerce for the purpose of trying to settle differences between the Voters League and the school district, which meeting was attended by officials of the Voters League, Chamber of Commerce officials, Dr. Cagle and members of the school board, plaintiff at or near the end of the meeting stated that Dr. Cagle was not representative of the blacks and that he "must go" as school superintendent and angrily demanded his resignation.

10. Such conduct on the part of plaintiff in publicly criticizing and insulting the superintendent and demanding his resignation had reduced the effectiveness of the superintendent in performing his duties and directing the efforts of approximately 410 employees of the school district.

The evidence at trial revealed that Dr. Cagle has been superintendent since January 1974, having succeeded Barnett Dribben, longtime superintendent of the Greenwood schools. All members of the five-man school board appointed by the City Council are white except J. W. Bishop, a black member. All members of the present board have been in office since 1975. During Dribben's tenure, blacks who were interested in working at the polls were routinely granted leave to do so; ordinarily this would involve three or four blacks and no whites. During these absences it was uncertain as to how to classify the leave, i.e., either for personal reasons or otherwise. Since July 1975, personnel policy providing for leave has allowed one earned day per year cumulative to three days, and personal leave is granted only after prior arrangements have been made with the superintendent of schools or his designee. Personal leave days used are deducted from the number of sick leave days earned or accumulated. Sick leave is provided at the rate of one day per month for each contractual month employed, and if sick leave is exceeded, the teacher's salary is reduced by a contractual daily earned rate of pay. When excessive personal leave is taken, an amount equivalent to the teacher's daily pay is likewise deducted.

On November 2, 1978, Robert Sims and another black teacher, Mrs. Bailey, applied in writing, and plaintiff applied orally, to

their respective principals for leave of absence on election day. Also on November 2, a meeting of the school board was held at which the board discussed its current policy that all teachers requesting to work at polls on election day "must request in writing to the superintendent asking permission to be absent from school to work at the polls. If the request is approved, personnel will be docked the amount paid to them." Dr. Cagle testified that he requested clarification by the board as to the operational effect of the rule inasmuch as in the past it had been unclear whether taking off to work at the polls would be charged against personal leave or not charged as leave at all. The result was a resolution by the board that

the school district should not change at this time its written policy under which both professional and classified employees earned one day personal leave per year and should not refuse to permit an employee from taking this earned one day personal leave in order to work at the polls on election day, but that when an employee did not have unused such an earned one day personal leave, the Superintendent should not excuse such person from the performance of his work for the school district in order to enable such person to work at the polls in conducting an election and that in cases in which such employee did have as earned leave day the Superintendent should make it clear to such employee that the day taken by him from his duties in order to work at the polls used up one day of his earned personal leave.

Dr. Cagle advised the principals of the various schools, including Jackson, on Sunday, November 5, of the board's policy. Robert Sims, who had executed a written request to his principal, S. N. Outlaw, had his request disapproved by Dr. Cagle with the following notation: "The board at its meeting on November 2, 1978, declared that no teacher, employee or other staff member would be permitted to be excused from work to work in the elections. JRC" Mrs. Bailey likewise received a denial of her written request to work the polls.

Plaintiff, who had orally applied to his principal, was notified by Jackson at approximately 9 o'clock Monday morning, November 6, that his request had been denied by Dr. Cagle. Plaintiff then contacted J. W. Bishop, the black school board member, to ascertain the reason for the change in school board policy. According to plaintiff, Bishop told him that he was personally opposed to the change, but it was up to the superintendent under the new rule whether to grant leave. During the noon hour of November 6, plaintiff contacted James Hankins, school board president, to complain of the policy and was advised that teachers were employed to teach and not to work at the polls. Plaintiff did not contact Dr. Cagle to present his request personally in an effort to secure a reversal of Dr. Cagle's decision or to set in motion the grievance procedure provided by the school board policy, *i.e.*, from principal Jackson who had approved, to superintendent Cagle who had disapproved, to the school board as a whole.

Instead, after the school day of November 6, plaintiff at or about 4 p.m. appeared at the Greenwood TV station to make a statement in criticism of what had happened. Jordan's statement broadcasted from the TV station is appended in the footnote below.[5]

**5.** Ladies and Gentlemen, I am David Jordan, President of the Greenwood Voters League, one of the teachers in the Greenwood School System. I would like to report to the community, I want the black community of Greenwood to know this because I feel it is racially motivated and was done just right after the Voters League made its endorsement. The Greenwood School Board met on Friday night and made a ruling that no teachers in the City of Greenwood can work in the elections. Now this, ladies and gentlemen, is a racist act and I'm going to

inform the community about it. I've worked for the school system here for eight years. I've always worked at the polls. I think they are intimidating black teachers in the Greenwood School System just because I plan to be off. I'm certainly going to be off and Mr. Sims, Vice President, is going to be off because we feel this is a constitutional right. I want the public to know we are not defying the school board. We feel this ruling is racially motivated. Each teacher has 40 days—36 days, sick days and when a teacher is off working at the polls they

Plaintiff did not report to work for the school day of November 7, but instead he worked at the election polls.

Dr. Cagle did not at any time reprimand plaintiff for his unexcused absence on November 7, nor did he have contact with him in any way prior to the school board meeting on November 13, at which approximately 80 to 100 black citizens, including plaintiff, appeared. Later, open meetings sponsored by the Chamber of Commerce were attended by members of the black community, including plaintiff, Greenwood business people and members of the school board, as well as Dr. Cagle. In addition, meetings of the Voters League held on November 13 and 15, 1978, resulted in the drafting of a list of demands to be submitted to the school board by the black community which they perceived to be the results of racial discrimination, and on December 2, a march by blacks took place on the streets of Greenwood after their demands had been generally ignored. It was after this march that the Chamber of Commerce met with black leaders in an effort to resolve differences between the Voters League and business interests; later the school board and its superintendent entered into the open meetings. The discussion at

the Chamber of Commerce meetings concerned the list of demands submitted to the board by the black community. Among these demands was a request that Cagle resign. Plaintiff, who considers himself the spokesman for the Voters League, testified that it was his impression that the Chamber of Commerce meeting was an open meeting to air complaints by blacks of the community, and he did not understand that anything said by him would be used against him. In the course of several of these meetings, he stated that Dr. Cagle should be more sensitive to the needs of the black community and that the League wanted Cagle to resign; according to Jordan's testimony, he presented that demand on behalf of the League, not himself individually. The court finds as a fact that plaintiff made statements at a November Voters League meeting that Dr. Cagle should be disciplined or should be sent out of the community on a midnight train to Georgia. Other subjects were discussed in open meetings of the school board, the League, and the Chamber of Commerce which were held during the period of November 1978 through January 1979.

Although Dr. Cagle testified that plaintiff's derogatory remarks about him and his

pay that substitute fee which is $20 and the school board made this ruling along with the recommendations of Dr. Robert Cagle, who I consider to be one that is against black teachers in this town and in this area to not allow any teacher to work at the poll because he is admantly [sic] against the Voters League endorsement and we are going to fight this tooth and nail. I'm going to call a special meeting of the Greenwood Voters League to ask Dr. Cagle and the Board to repeal such actions. I've been in contact with the president of the Board, he's aware of my action. I've talked to the black member of the school board. I want them to know this is intimidation and certainly I'm not going to take it. The black community, hopefully, will back me and we are going to take action against them. So, finally, David Jordan, President of the Greenwood Voters League is calling a special meeting of the organization Wednesday night to deal with this racist act of the Greenwood School Board not permitting teachers to work in the election. Mind you, the county is out the whole day. We are not asking for any special favors, but it is a constitutional right and we do, we pay for that day off and we do have 36 sick days and we do have

one business day. So they made that ruling in order to stop the Voters League to interefere [sic] with the endorsement because many people feel they do not like the endorsement the league made in support of Major [sic] Charles Evers. So, I'm asking all citizens to meet at the Greenwood Voters League and students, the total community. We're going to deal with this problem, we are going to see that justice is done. We are not going to let the school board push us around like we are a bunch of children. Neither are we going to let the superintendent. I hope he is listening because I'm going to face him right on with this issue. I am not angry, but I'll fight discrimination. I am not going to be in the midst of a school system to let a superintendent come into this town and take away the rights of teachers along with mine. I would rather go all the way to the jail or whatever is necessary to do. We are going to fight it tooth and nail. I want the students to know this, I want all the parents to know this, I want the total community, black and white, because Dr. Robert Cagle is wrong and we are going to fight this tooth and nail until they repeal this ruling. Thank you.

administration diminished his standing as an educator and his effectiveness as superintendent of the public school, the undisputed proof is that there was no walkout, boycott or other disruptive activity by students or teachers as a result of plaintiff's behavior; indeed, the school year, as a whole, was uneventful.

On the date that plaintiff took his unexcused absence to work at the election polls, he was docked $67, or his rate of daily pay. According to Cagle, plaintiff had exceeded the allowable number of absences for personal leave. The superintendent stated that he communicated this information to Jackson.[6] Similar information was communicated to Robert Sims who, in fact, had unexhausted personal leave, and was thus erroneously denied leave to work at the polls. This error was later corrected, and Sims was docked only a personal leave day, and not reprimanded for taking an unexcused absence.

The evidence shows without dispute that plaintiff was the only teacher who was not recommended by the superintendent for rehire although he was so recommended by his principal. In fact, plaintiff's nonrenewal of contract was the only instance in which the superintendent failed to follow the principals' recommendations. Also, it is without dispute that as a general rule, Cagle did not have daily or weekly contact with plaintiff, nor did he have meetings of any kind on a regular basis with plaintiff as

a classroom teacher in his capacity as superintendent of the school system. It was admitted that plaintiff was a competent classroom teacher, and the quality of his work performance had not been challenged. As of the date of the evidentiary hearing, the principal of the Williams School and the superintendent had not filled the vacancy caused by the nonrenewal of plaintiff's contract.

The evidence showed that the school board meeting of November 2 took place the night before the Voters League formally endorsed Charles Evers on Friday, November 3, although there were prior indications that the League would in all likelihood support Evers in his race for the United States Senate. According to plaintiff, Bishop, the black school board member, advised him the board had met on the night of November 3, or the same night that the League had formally endorsed Evers' candidacy, and that information was the basis for plaintiff's statement that the board had acted to change the leave policy because of the League's support of Evers, a black candidate running against two white opponents in the general election. Bishop did not testify to contradict plaintiff's testimony in this regard.

An issue arose in the evidence as to whether the school board at its meeting of April 5, at which it approved the recommendation of teachers submitted by Superintendent Cagle, also supported Cagle's de-

6. Under the policy instituted in 1975, personal leave days were earned at a rate of one per year, with a maximum allowable accumulation of three personal leave days. Cagle reached the conclusion that plaintiff had no unused personal leave days on the basis that plaintiff had taken, in the 1976–77 school year alone, at least four personal leave days, and in the 1977–78 school year two personal days so that plaintiff had exhausted future leave days for the 1978–79 school year. Plaintiff on the other hand testified that no one in the school administration had ever informed him that use of personal leave days in excess of the allotted maximum in any one year would be applied against leave days to be accumulated in future years. Apparently plaintiff had not taken a personal leave day during the 1978–79 school

year, and prior to Monday, November 6, there had been no determination that plaintiff had no unused personal leave.

The teacher's handbook (p. 91) relating to personnel working at the polls on election days, did not, as Dr. Cagle testified, make clear how the days would be classified, i.e., whether a C-day (personal leave) or A-day (sick leave) or otherwise, but stated only that "personnel will be docked the amount paid to them." The handbook did not state that leave to work at election polls would be annually accumulated and charged against the teacher's future leave privileges. According to Dr. Cagle, such future charge was implied but it was for the purpose of eliminating any confusion that he sought clarification from the board and adoption of the November 2 resolution.

cision not to rehire plaintiff.[7] An article in the local newspaper published Sunday, April 8, reported that plaintiff's contract would not be renewed after the board had met in a closed session the previous Thursday night. The newspaper article reported that "The school board vote against Jordan reportedly was 4–0, with one member not voting." The article further stated that board president Hankins had advised the Greenwood newspaper Saturday night that plaintiff "had been sent a letter dated April 6, the date following the board's executive session, telling him that he was not being recommended for contract renewal."

At the school board hearing on the nonrenewal of plaintiff's contract, the parties presented altogether some 17 witnesses, and the taking of testimony lasted approximately 18 hours. The hearing was monitored by the hearing officer, Hite McLean, who was responsible only for conducting the hearing in an orderly manner and had no voice in the final decision of the board. The testimony adduced at the hearing, although it provided more details from substantially more witnesses' points of view, did not vary materially from that presented to this court.[8] Most of the witnesses for the school district testified as to the disruptive effect which plaintiff's statements at the January 23 Chamber of Commerce meeting had on the harmony which had prevailed at that meeting. See, e.g., testimony of John M. Lovorn, Jr., William H. Roberson, John O. Emmerich, Jr., and James D. Green. Other testimony for the school district was tendered to show Cagle's past efforts to preserve racial balance on the faculty, protect the interests of blacks within the school system, and establish that the superintendent's recommending plaintiff for rehire in 1979–80 would have diminished his authority and effectiveness as chief administrator within the school system. See testimony of John McHann and Whitley Wilson. Witnesses for the plaintiff at the board hearing testified to substantially the same effect as plaintiff's witnesses did in the federal court hearing. The board made written findings upholding the superintendent's decision not to rehire plaintiff, concluding that each of the charges made in the superintendent's letter had been sustained by evidence before the board, and that each charge "except reason number 2 constitutes in itself alone a good and sufficient reason for Dr. Cagle not recommending Mr. David Jordan for said employment." The vote of the board to uphold was 4 to 0, with Dr. J. L. Anthony abstaining inasmuch as he had expressed his views publicly in a letter to the editor of the Greenwood Commonwealth.

At the court hearing, Dr. Cagle denied that he submitted his nonrecommendation of plaintiff to the board for a formal vote at the April 5 meeting, stating that nonrecommendations did not require board approval. He conceded, however, that he did inform the school board members of his decision not to recommend plaintiff, and gave them a synopsis of his reasons therefor. There was no occasion for a formal vote by the board on the superintendent's failure to recommend plaintiff for reemployment until the board hearing, which was called at the plaintiff's request, concluded on May 9.

At our hearing, no school board member appeared to testify, but defense counsel introduced an affidavit signed by all members of the school board other than Dr. Anthony, stating among other things that they had no interest in plaintiff's political activities and that the board's vote was in no way influenced by plaintiff's political activities. The affidavit of the board members conceded that they had discussed Cagle's nonre-

---

**7.** It is undisputed, however, that sometime prior to the April 5 meeting and well before Cagle submitted his recommendations to the board, Cagle and board president Hankins met with "the original Chamber of Commerce people who had initiated these other meetings," (Board hearing trans., testimony of John O. Emmerich, Jr., pp. 252–55), to discuss Cagle's intent not to recommend that plaintiff be rehired to "get feedback," according to Cagle, from the business community on that decision. Cagle's stated purpose in meeting with the Chamber leaders was to determine whether any of the leaders might sway his position.

**8.** The one exception is pointed in n. 4, supra.

commendation but had not given the superintendent any assurance that his decision not to renew plaintiff's contract would be upheld, as it was their understanding that they were without authority to approve or disapprove the superintendent's decision and were without authority to offer a contract to plaintiff unless, following a board hearing, it was determined that reemployment should be offered to him.

## II. APPLICABLE LAW

### A. *Necessity for § 5 clearance.*

■■■ At the outset, we quickly dispose of plaintiff's claim that the change in school board policy regarding personal leave constituted a "standard, practice or procedure with respect to voting," within the context of § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, and that to be effective, the school board's new policy had to receive clearance from the Attorney General of the United States or a declaratory judgment from the United States District Court for the District of Columbia upholding its racial neutrality. Such a determination is legally beyond our jurisdiction as a single-judge court since the statute expressly mandates the convening of a three-judge court. Plaintiff has not requested the organization of such a statutory tribunal and thus cannot now rely upon a claim of § 5 violation. *See Sumter County Democratic Executive Comm. v. Dearman*, 514 F.2d 1168 (5 Cir. 1975); *see also Broussard v. Perez*, 572 F.2d 1113 (5 Cir.), *cert. denied*, 439 U.S. 1002, 99 S.Ct. 610, 58 L.Ed.2d 677 (1978) (no requirement that three-judge court be convened if constitutional issue is insubstantial). Simply by way of dictum, the argument, however, has no appeal to us. Admittedly, the school board policy did not receive such preclearance, nor was it, in our view, at all necessary to resort to such procedure to be legally effective. Plaintiff's reliance upon *Dougherty County, Georgia, Bd. of Educ. v. White*, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978), is here inapposite. The Supreme Court in *White* held that § 5 applied to the case of a school board's implementation of a policy contained in its Rule 58, providing that any employee of the school system who becomes a candidate for an elective political office would be required to take a leave of absence, without pay, for the duration of his political activity and, if elected, during the period of service in public office. In the case sub judice, the new rule governing personal leave related to a facially neutral personnel practice, was only to clarify internal administrative matters, and did not constitute "constraints on employee political activity affecting voter choice" within the context of § 5. 439 U.S. at 41, 99 S.Ct. at 374, 58 L.Ed.2d at 279. Although we are mindful of the broad reach of § 5 of the Voting Rights Act as elucidated in *Allen v. State Bd. of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), and its progeny, which brings within its scope a great variety of matters having a potential for a change in voting "standards, practices or procedures," the school board's adoption of the revised leave policy clearly falls outside the ambit of § 5. This is not the type of school policy which *White* envisioned as being within the scope of § 5, and no other case authority has been cited to us to support plaintiff's contentions. We, therefore, hold that this argument, if not beyond our jurisdiction, is wholly without merit.

### B. *Constitutional implications of the present controversy.*

■■■ Federal courts generally should be slow to intervene in the internal personnel affairs of this nation's public schools. *See Bishop v. Wood*, 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684, 693 (1976); *Megill v. Bd. of Regents, State of Florida*, 541 F.2d 1073, 1077 (5 Cir. 1976). Landmark decisions of the United States Supreme Court over the past decade nevertheless make clear that the dismissal of public school teachers, or the failure by school authorities to rehire nontenured teachers, may not be based upon a teacher's exercise of free speech protected by the first and fourteenth amendments. *Perry v. Sindermann*, 408 U.S. 593, 596–98, 92 S.Ct. 2694, 2696–98, 33 L.Ed.2d 570 (1972); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct.

1731, 20 L.Ed.2d 811 (1968). Moreover, in *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and *Givhan v. Western Line Consolid. Sch. Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Supreme Court has set forth an established formula to be applied by federal district courts with respect to the order and allocation of proof in those cases where the dismissal of a teacher has been allegedly motivated by constitutionally impermissible reasons. Stated simply, the legal issues posed for our determination are: (1) whether the public, or private, statements by plaintiff critical of Cagle and the board were constitutionally protected, taking into account the special first amendment considerations present in a public school context; (2) if plaintiff's communications were so protected, whether plaintiff has shown that such communications were a substantial factor in the board's decision not to rehire; and (3) if plaintiff has affirmatively carried the burden on the two stated issues, whether the school board has proved by a preponderance of the evidence that it would have reached the same decision not to rehire, irrespective of the fact that plaintiff had engaged in the constitutionally protected conduct.

In *Pickering, supra,* a public school teacher was dismissed from employment for publicly criticizing, in a letter published in a local newspaper, the handling by the school board and superintendent of a school bond issue proposal and the system's allocation of funds between athletic and educational programs. The Supreme Court rejected the contention that teachers, by virtue of their position, forfeit all first amendment rights to "comment on matters of public interest in connection with the operation on the public schools in which they work," 391 U.S. at 568, 88 S.Ct. at 1734, and held that the determination of whether a teacher's speech is constitutionally protected entails a balancing of the teacher's interest in speaking out on matters of public concern and the school board's "need for orderly school administration," *id.* at 569, 88 S.Ct. 1731.

■ Specifically, *Pickering's* balancing test requires the court to assess whether the content of a teacher's public statements has had an adverse effect on the proper performance of his classroom duties, on his working relationship with the objects of his criticism, or on the regular operation of the schools generally. *Givhan, supra,* 439 U.S. at 414, 415 nn. 3, 4, 99 S.Ct. at 696 nn. 3, 4, 58 L.Ed.2d at 624 nn. 3, 4. In the case sub judice, plaintiff is said to have made critical public utterances which the board found to constitute grounds for nonrehire.

■ With respect to the content of plaintiff's public statements, *see* nn. 1 and 5, *supra,* we have concluded that his accusations as to the policies of Cagle and the board, though unquestionably abrasive, generally reflect only plaintiff's opinion as to matters of "legitimate public concern," *Pickering,* 391 U.S. at 571–72, 88 S.Ct. 1731.[9] Of course, plaintiff's public communications are not constitutionally protected if such statements were made by him knowing they were false or in reckless disregard of whether they were true. *See Pickering,* 391 U.S. at 574–75, 88 S.Ct. 1731. Defendants, relying upon *Megill,* contend that certain portions of plaintiff's November 6 statement were factually inaccurate, *i.e.,* that the November 2 board meeting was called to change or clarify school policy with respect to teacher leave to work at the polls and not, as stated by plaintiff, *after* the Voters League had endorsed Evers' candidacy for the Senate. Plaintiff's statement was factually inaccurate. We cannot say, however, that plaintiff's remarks on this subject were totally "without foundation in fact," *Megill,* 541 F.2d at 1083, or that plaintiff knew his statement was not true. As we have discussed at page 1205 *supra,* plaintiff had contacted board mem-

---

9. We note that since none of plaintiff's public statements involved the use of excessive profanity directed toward the superintendent or board, the board's interest in avoiding loss of public respect for its faculty is not implicated under the facts of this case. *See Duke v. North Texas State Univ.,* 469 F.2d 829 (5 Cir. 1972), cert. denied, 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973).

ber J. W. Bishop to ascertain reasons for the change in policy; from that conversation a misunderstanding on the part of plaintiff as to when the board had met arose.[10] Presumably, Bishop would know when the board had acted, and we find that in relying upon this conversation with Bishop as a basis for his TV statement, plaintiff did not act in reckless disregard for the truth. Nor does the evidence support a conclusion that plaintiff actually knew the true sequence of events when he appeared on TV.

Defendants contend that plaintiff's charges that the school board's actions were "racially motivated" in his November 6 speech, and that Dr. Cagle was a "racist," in the November 13 school board meeting, were false. We refuse to become embroiled in determining the actual truth or falsity of such allegations for the purpose of ascertaining whether plaintiff's statements were constitutionally protected.[11] Even assuming that plaintiff's allegations were in fact false, we cannot say from the proof adduced before either the board or this court that, given his understanding, after talking with Bishop, as to the sequence of events which had occurred, plaintiff either knew his statements to be false or that he made them in a reckless manner.[12]

We now turn to the second step of the *Pickering* equation, which requires us to assess the impact of plaintiff's public statements on the operation of the Greenwood schools. As we have discussed above at pp. 1206–1207, no actual disruption of the operation of the schools occurred as a result of plaintiff's criticisms of Dr. Cagle and the board. No evidence before the board or this court tended to show that plaintiff's conduct actually created any discord or serious disciplinary problems among his fellow workers which impeded the orderly operation of the schools, *see, e.g., Moore v. Winfield City Bd. of Educ.,* 452 F.2d 726 (5 Cir. 1971). Furthermore, plaintiff's lack of a close working relationship with Cagle or the board undermines any claim that plaintiff's personal loyalty is necessary to the proper functioning of the school system. In *Givhan, supra,* the Supreme Court commented upon *Pickering* as follows:

> The *Pickering* Court's decision upholding a teacher's First Amendment claim was influenced by the fact that the teacher's public statements had not adversely affected his working relationship with the objects of his criticism:
>
> "The statements [were] in no way directed toward any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Pickering v. Board of Education, supra,* 391 U.S., at 569–570 [, 88 S.Ct. 1731, at 1735, 20 L.Ed.2d 811].

439 U.S. at 410 n. 3, 99 S.Ct. at 696 n. 3, 58 L.Ed.2d at 624 n. 3.

---

10. Bishop, according to plaintiff, told him that the board meeting at which the resolution was adopted took place on Friday, November 3, the same night that the Voters League endorsed Evers. As noted previously, Bishop did not testify to contradict plaintiff's testimony in this regard.

11. Plaintiff has based his claims on first amendment free speech and denial of procedural due process. No claim has been raised either in the briefs or oral arguments of counsel that plaintiff's nonrenewal was racially motivated, or that the Equal Protection Clause was implicated.

12. We note that in *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court held that an inference of purposeful racial discrimination may indeed be gleaned from an examination of "the specific sequence of events leading up to the challenged decision," 429 U.S. at 267, 97 S.Ct. at 564. It is quite understandable from plaintiff's point of view that the quick decision of unusual events on the eve of an important election might have been perceived to have racial overtones.

We note that the board's finding with respect to charge No. 10, see note 1 supra, states that the "course of conduct" on the part of plaintiff in "publicly criticizing and insulting" Cagle has "necessarily reduced the effectiveness" of Cagle as superintendent in directing more than 400 employees of the school district. No such effect was concretely shown by evidence presented by defendants before either the board or this court. Cagle's court testimony that, subsequent to plaintiff's statements, he was apprehensive about possible disruption in the school and was "scared every day" for the remainder of the year that trouble might arise in the school merely amounts to an "undifferentiated fear" which "is not enough to overcome the right to freedom of expression" in the school environment,[13] Tinker v. Des Moines Comm. Sch. Dist., 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969).[14] The second part of the finding concerning charge No. 10, that is, if Cagle had recommended plaintiff for further employment, such decision "would have the effect of disrupting faculty discipline and further impairing and hampering" Cagle's ability to direct school district employees, is similarly speculative. Where, as here, defendants have made no colorable showing that because of plaintiff's conduct employees of the school district have disobeyed any order by Cagle or other school policy, future predictions by the board of a break-down in discipline are totally lacking in force.

We conclude, therefore, that applying the balancing test mandated by Pickering to the facts of this case, where plaintiff's statements have had no demonstrable adverse effect on his classroom duties or on his close working relationships in the school, nor have they caused a substantial and material disruption in discipline or in the regular operations of the schools, plaintiff's interest in free speech must override what interests the school board may have in this instance. Thus, plaintiff has met his burden of showing that his public criticisms of the superintendent and school board were constitutionally protected.

Once plaintiff has shown that his conduct was constitutionally protected, he likewise carries the burden of proving that this conduct was a "substantial factor" in the board's decision not to rehire. Mt. Healthy City Bd. of Educ. v. Doyle, supra, 429 U.S. at 287, 97 S.Ct. 568. Since five of the ten grounds asserted by the board as reasons for nonrenewal involved constitutionally protected public statements by plaintiff, it is clear that plaintiff has met his burden in this regard.

C. Defendants' burden to show nonrenewal was permissible.

■ Finally, we address the third step of our inquiry, a step which, frankly, is critical to our decision in this case. Once the public teacher has carried his burden as to the first two issues, the school board "is entitled to show 'by a preponderance of the evidence that it would have reached the same decision as to [the teacher's] reemployment even in the absence of the protected conduct,'" Givhan, supra, 439 U.S. at 416, 99 S.Ct. at 697, 58 L.Ed.2d at 625. We emphasize that the board, and not the plaintiff, must carry the burden of proof by a preponderance of the evidence at this stage in our judicial review. The board's failure to meet its burden would deprive it of its authority not to rehire because it would be found to be acting in violation of plaintiff's

---

**13.** For an example of the varying results of application of these tenets compare Burnside v. Byars, 363 F.2d 744 (5 Cir. 1966) (wearing "freedom buttons" by students upheld since no disturbance other than "mild curiosity" was shown to have occurred in the school), with Blackwell v. Issaquena County Bd. of Educ., 363 F.2d 749 (5 Cir. 1966) (regulation barring "freedom buttons" upheld where proof showed their presence in school caused "commotion, boisterous conduct, a collision with the rights of others, an undermining of authority, and a lack of order, discipline and decorum"). Both of these cases were decided by the same panel of the Fifth Circuit on the same day, and were cited with approval by Tinker.

**14.** Although Tinker specifically dealt with the free speech rights of students, its principles are applicable to the exercise of such rights by teachers as well, Hastings v. Bonner, 578 F.2d 136, 143 (5 Cir. 1978).

constitutional rights. Conversely, if the board does meet the requisite burden, plaintiff, being an untenured teacher, would have no grounds for reemployment since reemployment under such circumstances would place the teacher "in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." *Mt. Healthy, supra,* 429 U.S. at 285, 97 S.Ct. at 575.

 We are mindful of the settled rule that "[a] school hearing procedure . . . conducted in accordance with the dictates of procedural due process is entitled to great weight and if substantial evidence appears to support the school board's action, that ordinarily ends the matter." *Thompson v. Madison County Bd. of Educ.,* 476 F.2d 676, 680 (5 Cir. 1973) (Clark, J., concurring); *Green v. Regents of Texas Tech Univ.,* 474 F.2d 594 (5 Cir. 1973). This rule was applied by this court in *United States v. Coffeeville Consolidated School Dist.,* 365 F.Supp. 990, 1002 (N.D. Miss. 1973), *aff'd in part and rev'd in part,* 513 F.2d 244 (5 Cir.1975). It was alluded to by us in *McCormick v. Attala County Bd. of Educ.,* 407 F.Supp. 586, 595 (N.D. Miss.), *vacated on other grounds,* 541 F.2d 1094 (5 Cir. 1976). In *McCormick,* we pointed out that the failure to accord procedural due process deprives the board of the substantial evidence rule and relegates testimony presented at a board hearing to nothing more than testimonial evidence which is to be considered along with that which is presented at trial. In the case sub judice, no serious attack has been made upon lack of procedural due process, although plaintiff does challenge the competency of the board to act with impartiality, a contention which we reject out of hand. To preclude a school board of its authority to conduct hearings of aggrieved teachers would require convincing proof that the board was so infected with prejudice and partiality that it was

incapable of rendering a fair determination based on evidence presented before it, and we do not find that plaintiff's evidence approaches any such level of the board's incompetency. Surmise and conjecture are simply not to be equated with convincing evidence to sustain a claim that a majority of the school board (Bishop, Bidwell and Mink) was incapable of conducting a fair hearing.

Bearing in mind the foregoing principles, we have endeavored, as is our duty, to carefully examine every reason found by the school board, *Megill, supra,* 541 F.2d at 1081; *Whitsell v. Southeast Local Sch. Dist.,* 484 F.2d 1222, 1229 (6 Cir. 1972), should be conclusive upon us because of the substantial evidence rule or whether its findings may be properly inquired into in accordance with the obligations cast upon us by the Constitution and the controlling Supreme Court decisions.[15]

First, we hold the salient fact to be, as conceded by the board itself, that the reason asserted in charge No. 2 (rudeness to the superintendent's secretary), the reason assigned in charge No. 1 (plaintiff's son's free lunch application), and charge No. 3A (failure to submit request for leave in writing and not orally), as conceded by Dr. Cagle on the witness stand, would not, standing alone, singly or collectively, be sufficient to justify not rehiring plaintiff. Clearly, the inclusion of these three charges may be viewed only as pretextual in the light of the entire record of this case. The free lunch incident had been resolved in 1975, the plaintiff had been consistently each year thereafter recommended by his principal and superintendent and rehired by the board, and the matter had long ago been resolved. Since the board has admitted that charge No. 2 is without substance, we need not discuss it further as an independent ground for nonrenewal. With respect to charge No. 3A, the board's finding that the request for leave had to be in

---

**15.** See *Pickering,* 391 U.S. at 578 n. 2, 88 S.Ct. at 1740 n. 2:

This Court has regularly held that where constitutional rights are in issue an indepen-

dent examination of the record will be made in order that the controlling legal principles may be applied to the actual facts of the case.

writing and not oral, in our opinion, clearly exalts form over substance and the mode of the request was not noted nor was it the subject of reprimand by the principal, Dr. Cagle or any board member at any time prior to the notice of nonrenewal of this teaching contract.

 More serious questions, however, are presented by the board's findings with respect to charge Nos. 3 and 5. The essence of No. 3 is that the plaintiff took an unexcused absence, knowing that the superintendent had specifically denied his request therefor. Clearly, under normal circumstances insubordination is a valid reason for the nonrehire of a teacher. *Hastings v. Bonner, supra,* 578 F.2d at 140 n. 13; *Love v. Sessions,* 568 F.2d 357, 361 (5 Cir. 1978); see *Bates v. Dause,* 502 F.2d 865, 867 (6 Cir. 1974); *Whitsell, supra,* at 1228–29 (6 Cir. 1972). Manifestly, dependability of its teachers is essential to the orderly operation of a public school, and when a teacher deliberately acts in absenting himself from his classroom duties, without excuse, the educational process, if not halted, is seriously frustrated.

 The unique circumstances shown by the evidence in this case compel us to conclude, however, that this single incident in the career of a successful teacher, which was not the subject of prompt reprimand by his superiors, was clearly motivated not by disloyalty to the school system but by desire to participate in the electoral process as he had been accustomed to in the past. The quick change in the board's policy regarding leave for this purpose, which was communicated by the superintendent to Principal Jackson no sooner than Sunday, November 5, and relayed to plaintiff the following day, only one day before the election, would constitute a mitigating factor in view of the total context of this case. Serious though an act of insubordination of this character might appear to be, we are not persuaded that this isolated incident, standing alone, would have moved either the superintendent to disapprove or the board not to rehire plaintiff for the coming year.

Bearing in mind that the burden rests upon the board to show both the truth *and* sufficiency of the insubordination by a preponderance of the evidence, at this stage of the case, we note several omissions of evidence which we think would be necessary to meet the preponderance of evidence standard. For example, the evidence fails to show, as noted, that the superintendent issued any reprimand to the plaintiff or took any action other than docking plaintiff one day's salary for taking unexcused leave. The record is devoid of any evidence by defendants that any other teacher had ever been dismissed or not rehired because of the failure to comply with school board regulations regarding leave. Indeed, there is no proof of a stated board policy, or official custom, which fairly put plaintiff on notice that if he took a single unexcused absence, he would be subject to the loss of continued employment. In the final analysis, defendants have failed to satisfy their burden that taking one day as an unexcused absence, even though leave therefor was specifically denied by the superintendent, had ever been a ground for the nonrenewal of a teacher's contract in the Greenwood public schools. Where the defendant school board has assigned a number of reasons for the nonrehire of a teacher, the great majority of which are based either upon constitutionally protected speech of the teacher or are patently without substance, we can view the board's asserted reliance on insubordination as an independent ground for nonrenewal only as pretextual. In so doing, we limit our holding expressly to the facts in this case, and in no way condone deliberate acts of insubordination by a public school teacher contrary to the orders of his superior or board policy.

Respecting the findings in charge No. 5 that plaintiff in taking his one day's unexcused absence failed to follow the school board's stated grievance procedure, we find that although this precise question was left open in *Pickering*,[16] the uncontradicted evi-

---

**16.** "There is likewise no occasion furnished by this case for reconsideration of the extent to which teachers can be required by narrowly drawn grievance procedures to subi

dence in this case shows that plaintiff did appeal to his principal and after being told that it was a board policy, not subject to change, he contacted two board members, one of whom was the president, who told him no relief would be forthcoming. True enough, he did not follow to the letter the school board's grievance policy since he by-passed the superintendent and did not appear before the board as a whole. However, in view of the hastily revised leave policy and the lateness of its communication to plaintiff, failure to comply literally with the formal procedure, under such circumstances, is not wholly unreasonable, nor, in our opinion, did defendants discharge their burden of proving that this omission would have, or ever had, or actually did, serve as an independent basis for nonrenewal.

We find, therefore, that the board has failed to prove by a preponderance of the evidence that reasons apart from the plaintiff's constitutionally protected conduct were, in fact, sufficient, independent grounds for his nonrehire. On the contrary, we are persuaded that the dominant motivation for the defendants' action was retaliation for the plaintiff's exercise of his first amendment right of free speech. To view this entire record in any other light would place us in the position of not following what we understand to be controlling legal principles applied with objectivity to the facts which we have found from the whole evidence of this case.

Accordingly, for the reasons stated, a preliminary and permanent injunction shall be issued forthwith reinstating plaintiff to his former teaching position for the year 1979–80 without diminution in duties, salary or other benefits of employment otherwise accruing.

complaints about the operation of the schools to their superiors for action thereon prior to bringing the complaints before the public." 391 U.S. at 572 n. 4, 88 S.Ct. at 1737 n. 4.